## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

GREGORY JOHNSON,         )
                             )
          Plaintiff,     )
                             )
v.                        )   Docket No. 2:21-cv-00089-NT
                             )
WHOLE FOODS MARKET GROUP,   )
INC.,                   )
                             )
         Defendant.   )

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before me is the Defendant's Motion for Summary Judgment ("**Def.'s MSJ**") (ECF No. 37). For the reasons stated below, the motion is **GRANTED IN PART** and **DENIED IN PART**.

## FACTUAL BACKGROUND[1]

This case involves a dispute over the treatment and firing of the Plaintiff, Gregory Johnson, who worked as a Supervisor at Defendant Whole Foods Market Group, Inc.'s ("**Whole Foods**") store in Portland, Maine. Pl.'s Resp. to Def.'s Reqs. to Strike ("**SMF**") ¶¶ 6, 111 (ECF No. 46). There are a few Whole Foods employees that played a role. Within the Portland store, Scott Johnson held the highest position as

---

[1]     The following background is drawn from the Plaintiff's Response to Defendant's Requests to Strike ("**SMF**") (ECF No. 46), which incorporates the Defendant's Local Rule 56(b) Supporting Statement of Material Facts (ECF No. 36), the Plaintiff's Opposing Statement of Material Facts and Statement of Additional Material Facts (ECF No. 42), and the Defendant's Reply Statement of Material Facts (ECF No. 45). Both parties have requested that I strike the opposition's facts. *See* SMF ¶¶ 7, 14, 16, 17, 23, 36, 43, 47, 52, 55, 56, 69, 74, 91, 93, 98, 99, 121, 122, 131, 135, 139. I address the requests to strike only where I have relied on a fact requested to be struck, as noted below.

the only Store Team Leader. SMF ¶ 91; Dep. Tr. of Christina Oertel Dec. 15, 2021 ("**Oertel Dep.**") 27:17–28:11 (ECF No. 35-70). Beneath Scott Johnson were other Team Leaders like Sean Danis, the Store Support Team Leader. Oertel Dep. 29:25–30:10; Dep. Tr. of Sean Danis Dec. 15, 2021 ("**Danis Dep.**") 13:7–13:13 (ECF No. 35-71). Beneath the Team Leaders were the Associate Team Leaders: Amber Woodley, Jeff Kudile, Jason Shaw, and Emma Sobocinski. Danis Dep. 13:23–14:1; Oertel Dep. 27:5–27:14; Danis Dep. 32:24–33:1; Dep. Tr. of Amber Woodley Mar. 24, 2022, at 11:17–11:20 (ECF No. 35-79); SMF ¶¶ 44, 101, 134, 136. Below the Associate Team Leaders were Supervisors, Trainers, and Cashiers. Oertel Dep. 26:4–27:1. Michael Konek and Jerry Syrek were Supervisors. SMF ¶¶ 99, 137.

Team Member Services, a regional team at Whole Foods, also became involved in the dispute. The highest staff person involved was Danielle Tenczar, the Senior Team Leader for Team Member Services. *See* Oertel Dep. 47:7–47:10. Tenczar supervised Laura Stone, a Team Member Services Team Leader. Oertel Dep. 46:24–47:6. Stone was also designated as Whole Foods's Rule 30(b)(6) witness. Dep. Tr. of Laura Stone Feb. 6, 2022 ("**30(b)(6) Dep.**") 21:4–21:11 (ECF No. 35-72). Stone supervised Team Member Services Generalist Christina Oertel. SMF ¶¶ 25, 134; Oertel Dep. 46:24–47:6. In addition to the Team Member Services group, Whole Foods worked with a third-party administrator, Sedgwick Claims Management Services, Inc. ("**Sedgwick**"), on reasonable accommodation requests. SMF ¶ 26; Letter, dated 11/4/19 ("**Sedgwick Letter**") 1 (ECF No. 35-24).

Whole Foods hired Johnson as a cashier on April 6, 2019. SMF ¶ 6. During his interview with Store Support Team Leader Sean Danis, Johnson disclosed that a gap in his resume was due to his disability, though he did not elaborate on what that meant. Dep. Tr. of Gregory Johnson Dec. 17, 2021 ("**Johnson Dep.**") 18:2–19:6 (ECF No. 35-1).

On June 3, Whole Foods promoted Johnson to Store Support (Customer Service/Cashier) Supervisor at Danis's recommendation. SMF ¶ 13. Around this time, Johnson began to repeatedly violate Whole Foods's attendance policies on callouts and late arrivals. SMF ¶ 22. Johnson attributed these attendance infractions to sleep medications that he was taking for post-traumatic stress disorder ("**PTSD**"). SMF ¶ 22. On August 20, he received a written warning for the violations. SMF ¶ 23.

After receiving the warning, Johnson requested a medical leave of absence. SMF ¶ 24. He had previously undergone clinical treatment for PTSD, anxiety, depression, and obsessive-compulsive disorder, and he reported experiencing severe PTSD flare-ups. SMF ¶¶ 116, 118. With the help of Team Member Services Generalist Christina Oertel, Johnson obtained an emergency leave of absence from Whole Foods and Sedgwick for August 30, 2019, to September 19, 2019. SMF ¶¶ 25–26.

To return from leave, Johnson had to submit a certification form. Letter, dated 9/20/19 (ECF No. 35-35). On September 16, Johnson's therapist, Darylann Leonard, completed the form, stating that Johnson needed the leave due to a PTSD flare-up and that Johnson's "condition shouldn't impact job performance as long as accommodations are made for absences." SMF ¶¶ 28, 35; Certificate for Serious

Health Condition (ECF No. 35-15). Johnson's flare-up occurred because of his involvement in a criminal case against his uncle, whom Johnson alleged had sexually molested him as a child. SMF ¶¶ 29–30.

On September 18, 2019, the day before he returned to work after his leave of absence, Johnson sent an email to Oertel with the subject line: "RE: Leave documents," asking Oertel to forward his leave documents to Sedgwick. E-mail, dated 9/19/19, at 1 (ECF No. 35-34). Johnson made a request for intermittent leave at this time.[2] SMF ¶ 37.

On September 23, 2019, shortly after Johnson returned to work from his leave of absence, Store Support Associate Team Leader Amber Woodley completed a 90-day performance evaluation. SMF ¶ 36. She noted that Johnson "need[ed] to keep an

---

[2]     Whole Foods contends that Johnson did not request intermittent leave until October 3, 2019. SMF ¶ 37. The copy of the email string between Johnson and Oertel does not include the leave documents that Johnson attached. *See* E-mail, dated 9/19/19 (ECF No. 35-34). Other evidence, however, supports the Plaintiff's claim that he requested intermittent leave as an accommodation in September, and Sedgwick acknowledged that it "was notified of [Johnson's] request for a reasonable accommodation" on September 18, 2019. Letter, dated 11/4/19 ("**Sedgwick Letter**") 1 (ECF No. 35-24); *see also* SMF ¶¶ 37–38; Dep. Tr. of Christina Oertel Dec. 15, 2021 ("**Oertel Dep.**") 40:20–41:6, 50:2–50:7 (ECF No. 35-70) (stating that the paperwork Johnson sent on September 18 was likely related to his intermittent leave accommodation); Letter, dated 11/4/19, at 1 (ECF No. 35-24) (acknowledging receipt of request for reasonable accommodation on September 18, 2019); E-mail, dated 9/25/19, at 1 (ECF No. 35-37) (Oertel writing on September 25, 2019 that "Greg is in process on an ADAAA accommodation for intermittent absence"); Email, dated 9/27/19, at 1 (ECF No. 35-38) (Johnson reporting to Kudile on September 27, 2019, that "[d]ue to his work with Sedgwick, no one should tell him anything about his attendance"); Email, dated 9/30/19, at 1 (ECF No. 35-39) (noting on September 30, 2019, that Whole Foods still needed Johnson's medical certificate for intermittent leave and all the required paperwork for "other requests for scheduling etc for an 'at work accommodation' "); Email, dated 10/1/19 (ECF No. 35-40) (noting on October 1, 2019, that Johnson's "intermittent leave with Sedgwick is in progress" and asking for a medical certification form and a request form for at work accommodations).

eye on his attendance. He is currently on a written [warning]."[3]   SMF ¶ 36;
Performance Review, dated 9/23/19, at 2 (ECF No. 35-36).

Johnson's attendance issues continued. On September 25, Woodley emailed
Oertel seeking authority to put Johnson on a Final Warning for "cross[ing] an
attendance threshold" the day before. SMF ¶ 120. Johnson had told Woodley that his
attendance issue was related to his intermittent leave accommodation. SMF ¶ 120.
Oertel responded that Johnson was "in process on an [Americans with Disabilities
Act Amendments Act ("**ADAAA**")] accommodation for intermittent absence" and that
Woodley should not move forward with discipline until Johnson's paperwork was
reviewed. SMF ¶ 120; E-mail, dated 9/25/19, at 1 (ECF No. 35-37). Oertel testified

---

[3]     Johnson also had a text exchange with Woodley on September 25, 2019, that he found
demeaning. He texted Woodley about his concern that other Whole Foods employees were gossiping
about his leave. SMF ¶ 46. Woodley responded by saying,

> You have come incredibly far and you should be so proud of yourself. I know it's easier
> said than done but try to not listen to anything but the good stuff. I have not heard one
> bad or even slightly negative thing about you and trust me if anyone has a complaint
> I hear about it! Hold your head high,
>
> . . .
>
> Better yet we could come up with a really great story and see how fast it spreads, like
> you took you spent [sic] the past few weeks climbing Mount Kilimanjaro naked with
> the man of your dreams. If they're gonna talk let's give them something worthy of
> talking about!

Te[x]t Messages, dated 9/25/19 ("**Woodley Text**") (ECF No. 35-81). Johnson thought the message was
"unprofessional and demeaning." Dep. Tr. of Gregory Johnson Dec. 17, 2021 ("**Johnson Dep.**") 37:24
(ECF No. 35-1). He said, "Ms. Woodley . . . was aware that I was pursuing medical leave of absence.
So for her to minimize the seriousness of, A, me reporting that there's rumors going around the store
. . . ; and then, B, to minimize the seriousness of what I was going through personally by stating that
she would create a new rumor was just extremely unprofessional and demeaning . . . ." Johnson Dep.
37:16–38:7. Woodley took issue with Johnson's description of the exchange because she has a daughter
with a disability and has traveled the country working to reduce disability stigma. SMF ¶ 52. She also
noted that she covered for Johnson when he was late and called him to help him get to work on time
per his request. SMF ¶¶ 53–54.

that Whole Foods conditionally granted accommodations during the pendency of the approval process, and that Johnson's intermittent leave accommodation was conditionally approved at some point before October 28. Oertel Dep. 35:16–36:8; 62:22–62:24.

Also around this time, Johnson reported to Oertel about ongoing hostility from his superiors since returning from medical leave. SMF ¶ 121. Oertel summarized their discussion in a September 27, 2019, email to Store Team Leader Scott Johnson, Associate Team Leader Jeff Kudile, and Team Member Services Team Leader Laura Stone. E-mail, dated 9/30/19, at 2 (ECF No. 35-39). Oertel wrote that Johnson reported being upset by a comment that Woodley had said to him on the sales floor within earshot of others, that "you just HAVE to stop being late." E-mail, dated 9/30/19, at 2. Johnson was also upset that Danis used the words, "if the accommodations are validated" when Johnson complained to Danis about Woodley's comment. E-mail, dated 9/30/19, at 2. Johnson expressed further concerns about being scheduled to "clopen"[4] and take inventory, which required working until 2:00 am and which would interfere with his medication schedule and his ability to get adequate sleep. SMF ¶ 121; E-mail, dated 9/30/19, at 3.

On October 3, 2019, Johnson submitted a reasonable accommodation request form. SMF ¶ 37; Medical Accommodation Request Form ("**Request Form**") (ECF No. 35-16). The form stated that Johnson had the specific limitations of requiring

---

[4]     This appears to be a portmanteau for being scheduled to close the store and be back the next morning to open.

"schedule accommodation for appointments and symptom flare-ups on an intermittant [sic] basis." Request Form. To address these needs, Johnson required "[i]ntermittant [sic] leave as needed." Request Form. Whole Foods initiated its interactive disability accommodation process and interviewed Johnson on October 9.[5] SMF ¶ 40. During the initial interview, Johnson also asked Oertel for an accommodation of twelve hours between shifts due to his sleeping medications.[6] SMF ¶ 42.

On October 11, Johnson's psychotherapist Darylann Leonard completed an Accommodation Substantiation Form for Johnson. SMF ¶ 57. She stated that he needed twelve hours between shifts, no more than six days worked in a row, and schedule accommodations for flare-ups and therapy sessions. SMF ¶ 57; Accommodation Substantiation Form 2 (ECF No. 35-18); Dep. Tr. of Darylann Leonard Mar. 10, 2022, at 117:21–119:13 (ECF No. 35-73). Leonard indicated that these accommodations were needed because Johnson's PTSD substantially limited him in the major life activities of communicating, concentrating, interacting with others, sleeping, and thinking, and in the operation of his brain and digestive system.

---

[5]     Johnson asserts that, during the October 9 interview, Oertel made a comment to the effect that Johnson did not look disabled because his shoes were on the right feet and he was standing upright. Johnson Dep. 51:18–52:3. Oertel testified that she was speaking about the difficulty of having an "invisible illness." Oertel Dep. 22:21–22:22. Johnson found Oertel's comment condescending. Johnson Dep. 53:20–54:21.

[6]     Johnson's timecard shows that he was scheduled for less than twelve hours between shifts on four occasions in October. SMF ¶ 132; E-mail with attached G. Johnson Timecard, dated 10/24/19, at 4 (ECF No. 35-51); Oertel Dep. 91:7–93:4. Oertel testified that by October 28, Johnson had conditional "approval . . . to not stack his shifts. He needed to have shifts that were more than 12 hours apart." Oertel Dep. 35:6–36:8. It is unclear from the record when in October this conditional approval was given.

Accommodation Substantiation Form 2–3. Leonard estimated that the impairment was likely to last for one year, so the accommodations were suggested for September 18, 2019, to September 18, 2020. Accommodation Substantiation Form 1–2.

On October 21, 2019, Johnson left his keys for the change till (which was located at the customer service desk) on a checkout belt when he went on break. SMF ¶¶ 70–71. Danis found the keys that day and reported the incident two days later, on October 23. SMF ¶ 73; Investigation Notes 1 (ECF No. 35-21); E-mail, dated 10/23/19 ("**Oct. 23 Emails**") 2 (ECF No. 35-49). In response to Danis's report, Stone asked whether there was any precedent for disciplining employees who lost or misplaced keys. Oct. 23 Emails 2. Associate Store Team Leader Emma Sobocinski responded: "Yes, we have put team members on a written warning for leaving or losing keys. It doesn't happen frequently but I have validated that in the past they have been written up."[7] Oct. 23 Emails 1. Oertel noted in an email that she had never seen a write up for misplacing keys. E-mail with attached G. Johnson Timecard, dated 10/24/19 ("**Oct. 24 Email #1**"), at 1 (ECF No. 35-51). Woodley testified that misplacing keys is a "very severe" infraction that is grounds for either automatic separation or a final written warning. SMF ¶ 72. Stone stated that the level of offense would depend on how long the keys were misplaced, whether there was any monetary loss, and whether the individual had a history of corrective action. 30(b)(6) Dep.

---

[7]     At her Rule 30(b)(6) deposition, Laura Stone testified that losing keys would be worthy of corrective action, but she was not able to identify anybody with a key incident that had been issued corrective action. Dep. Tr. of Laura Stone Feb. 6, 2022 ("**30(b)(6) Dep.**") 107:22–107:25 (ECF No. 35-72).

64:18–65:5. Earlier that summer, Danis had left his keys unattended, and Johnson found them and returned them to him.[8] SMF ¶ 135; Johnson Dep. 167:12–168:17.

A week later, on October 28, 2019, Johnson was involved in another disciplinary matter. Danis scheduled him to take part in a training on the "cashup" procedure. SMF ¶ 76. Cashup involves handling all the store's cash in a small, windowless room. SMF ¶¶ 20, 96. Although the parties differ on the exact details, it is undisputed that Johnson told Danis that he could not do the procedure, his condition was triggered, he was leaving for the day, and he would request an accommodation pursuant to the Americans with Disabilities Act (the "**ADA**"). SMF ¶¶ 79, 81, 83, 140. Danis agreed that Johnson told him that being in the enclosed space triggered his condition, Danis Dep. 60:10–60:25, but in an email describing the incident to store leadership,[9] Danis did not mention that Johnson said this, SMF ¶ 84;

---

[8]    The Defendant "requests to strike" the first sentence of SMF ¶ 135, which states, "Although WFM never identified a single individual who had been disciplined for misplacing keys, . . . during the summer of 2019 Mr. Danis mistakenly left his own keys hanging out of the lock to the change till drawer." SMF ¶ 135. The Defendant provides two reasons for denying the first sentence: (1) Sobocinski identified other employees who were disciplined for the same reason; and (2) Danis found the Plaintiff's keys sitting on the front register belt. As to the first reason, although Sobocinski said in her email that she had verified that other Whole Foods employees had been disciplined, Stone, as the Rule 30(b)(6) witness, was unable to identify those employees. This is essentially a disputed issue. Second, I fail to see the relevance of where Danis found Johnson's keys when the fact is asserting that *Danis* mistakenly left his own keys hanging out of the change till drawer. Whole Foods admits that the "Plaintiff found Mr. Danis's keys and returned them to Mr. Danis." SMF ¶ 135. The request to strike is denied.

[9]    It is clear from the tone of his email that Danis was fed up with Johnson, describing him as "very toxic to the team" and asking his supervisors to address the situation immediately. E-mail, dated 10/29/19, at 4 (ECF No. 35-53). At some point, Danis advocated for Johnson's termination with store leadership. Danis Dep. 40:5–40:7. In addition to his "performance" and "attendance," Danis explained that his recommendation was because Johnson's "attitude . . . wasn't in line with Whole Foods culture," "[e]very conversation seemed difficult coming from him, as opposed to trying to work with someone to find a resolution," and "he didn't make other team members feel good working." Danis. Dep. 40:5–41:21.

E-mail, dated 10/29/19, at 3–4 (ECF No. 35-53). Johnson left his shift two hours before its scheduled end. SMF ¶ 86. He contacted Sedgwick to report his early departure. SMF ¶ 142. On his way out of the store, he told fellow Supervisor Jerry Syrek that Danis was an "asshole." SMF ¶ 87. He then sat in his car for "half an hour crying, bawling" and called a few lawyers before driving home. Johnson Dep. 187:4–189:5.

When Johnson returned for his next shift, Whole Foods started investigating his conduct. SMF ¶¶ 90, 143. Johnson was placed on administrative leave pending the investigation, pursuant to standard practice. SMF ¶ 92. As part of the investigation, store leadership interviewed Johnson on October 30. SMF ¶ 93. In his interview, Johnson admitted leaving his keys unattended on October 21. SMF ¶ 95. He also said that his conduct during the cashup incident was triggered by the enclosed environment and that cashup was not required for all supervisors and should not be required for him. *See* SMF ¶ 145; Investigation Notes 1.

On October 31, 2019, store leadership interviewed Syrek in connection with the investigation. SMF ¶ 101. Syrek reported that Johnson told him after speaking to Danis, "I knew I shouldn't have made the mistake of going to talk with that asshole. I'm sorry Jerry but I'm leaving. He can stay late and help you." Investigation Notice with Handwritten Notes 2 (ECF No. 35-58). Johnson denies saying he was leaving early so Danis could stay late. Johnson Dep. 185:23–186:10.

On November 1, 2019, Johnson emailed Oertel and accused Whole Foods of discriminating and retaliating against him because of his alleged disability. SMF ¶¶ 105, 149. Oertel responded three days later and denied that Whole Foods had

"engaged in any unlawful conduct." SMF ¶ 151. Whole Foods did not investigate Johnson's claims of discrimination and retaliation over the weekend between his email and the response, 30(b)(6) Dep. 119:11–119:23, but Oertel stated that she escalated the complaints to regional leadership, Oertel Dep. 147:18–147:22.

In the November 1 email, Johnson also inquired about the status of his accommodation request.[10] SMF ¶ 150. On November 4, Sedgwick notified Johnson that Whole Foods had approved his at-work scheduling accommodations. Sedgwick Letter.[11] Sedgwick recommended approval of all the requested accommodations for the period of September 18, 2019, to September 18, 2020, thereby retroactively excusing several of Johnson's absences, including his decision to leave after the cashup incident. SMF ¶ 107; E-mail, dated 11/7/19 (ECF No. 35-62). To exercise his intermittent leave accommodation, Johnson was supposed to notify his Team Leader that his condition was triggered and call Sedgwick's Absence Reporting Line. Sedgwick Letter 2; 30(b)(6) Dep. 83:13–83:25.

---

[10]    Sedgwick had sent the proposed accommodations to Whole Foods on October 22 and requested Whole Foods's approval within three business days. E-mail, dated 10/22/19, at 1 (ECF No. 35-47).

[11]    Stone explained in her deposition that the Whole Foods-Sedgwick relationship depended on the type of accommodation requested. For leave requests (like the August–September leave), Whole Foods followed Sedgwick's accommodation recommendation. For workplace accommodations, Whole Foods exercised discretion over whether to follow Sedgwick's recommendation based on the confines of the store's business operations. 30(b)(6) Dep. 34:25–36:13 (ECF No. 35-72).

The accommodation recommendations that Sedgwick sent to Whole Foods on October 22, 2019, included schedule accommodations for missed time, 12 hours between shifts, and no more than 6 shifts in a row from 9/18/2019–9/18/2020. It also included intermittent leave of absences from 10/10/2019 to 9/18/2020. Apparently, Sedgwick's recommended accommodations were approved by Whole Foods. An email from Oertel to Danielle Tenczar and Laura Stone dated November 7, 2019, referred to Sedgwick's recommendation and stated that Johnson "has excused absences [related to his accommodation/intermittent leave] on 9/23, 9/25, 9/27, 10/22 and 10/28." E-mail, dated 11/7/19 (ECF No. 35-62).

On November 12, 2019, Johnson emailed Oertel for an update on the investigation, asserting that he had engaged in "protected activity under the ADA," and had been retaliated against for doing so. SMF ¶ 155. He reported being "mocked and belittled" for using his ADA leave and accommodations. SMF ¶ 155.

Two days later, on November 14, Whole Foods notified Johnson that he was fired. SMF ¶¶ 110–11. Store leadership concluded that Johnson had committed infractions of Whole Foods policies. SMF ¶¶ 108–09. They found that he failed to secure his keys, refused to complete the cashup task, used inappropriate language when referring to his team leader, and left early on October 28 without following proper procedure. Team Member Separation Form (ECF No. 35-25); 30(b)(6) Dep. 127:9–127:21. Upon receiving the termination call, Johnson said he would sue Whole Foods and hung up. SMF ¶ 113.

Johnson filed a complaint with the Maine Human Rights Commission in February of 2020 and received a right-to-sue letter on January 28, 2021. SMF ¶ 114. He filed suit in this Court two months later. Compl. (ECF No. 1). Counts I and II allege disparate treatment discrimination and hostile work environment discrimination in violation of the ADA and the Maine Human Rights Act (the "**MHRA**") (collectively, the "**Acts**"). Counts III and IV allege that Whole Foods retaliated against Johnson for requesting accommodations in violation of the ADA, MHRA, and Maine Whistleblower Protection Act (the "**MWPA**"). For each of these, Johnson seeks: (1) reinstatement, or front pay in lieu of reinstatement; (2) back pay from October 30, 2019, with prejudgment interest; (3) compensatory damages; (4)

punitive damages; (5) an award of reasonable attorney's fees and costs; and (6) all other damages to which he is entitled. Compl. ¶¶ 45, 50, 54, 58. Now, the Defendant moves for summary judgment on all counts and with respect to the Plaintiff's request for punitive damages.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' if the evidence 'is such that a reasonable jury could resolve the point in the favor of the non-moving party . . . .' " *Taite v. Bridgewater State Univ., Bd. of Trs.*, 999 F.3d 86, 93 (1st Cir. 2021) (quoting *Ellis v. Fid. Mgmt. Tr. Co.*, 883 F.3d 1, 7 (1st Cir. 2018)). "[A]nd a fact is 'material' if it 'has the potential of affecting the outcome of the case[.]' " *Id.* (quoting *Pérez-Cordero v. Wal-Mart P.R., Inc.*, 656 F.3d 19, 25 (1st Cir. 2011)). "The party moving for summary judgment bears the initial burden of showing" that no such dispute exists. *Feliciano-Muñoz v. Rebarber-Ocasio*, 970 F.3d 53, 62 (1st Cir. 2020). Once it does so, the burden shifts to the nonmoving party to respond "with sufficient evidence to allow a reasonable jury to find in its favor with respect to each issue on which it has the burden of proof." *Id.* (internal quotation marks omitted).

In reviewing a motion for summary judgment, I must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *EdgePoint Cap. Holdings, LLC v. Apothecare Pharmacy, LLC*, 6 F.4th 50, 57 (1st Cir. 2021). But I am "not obliged either 'to draw unreasonable inferences or credit

bald assertions or empty conclusions.' " *Theriault v. Genesis HealthCare LLC*, 890 F.3d 342, 348 (1st Cir. 2018) (quoting *Cabán Hernández v. Philip Morris USA, Inc.*, 486 F.3d 1, 8 (1st Cir. 2007)). "The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Henry v. United Bank*, 686 F.3d 50, 54 (1st Cir. 2012) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)).

## DISCUSSION

### I.    Discrimination Claims

#### A.    The Analytical Framework of the ADA & MHRA

The Plaintiff alleges disability discrimination under the ADA and the MHRA. The Acts prohibit employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. §§ 12111(2), 12112(a); *see also* 5 M.R.S. § 4572(2) ("A covered entity may not discriminate against a qualified individual with a disability because of the disability of the individual in regard to . . . discharge of employees . . . and other terms, conditions and privileges of employment."). Discrimination occurs under the Acts when an employer requires a disabled employee to work in an environment where they are abused or treated with hostility because of their disability. *Brader v. Biogen Inc.*, 983 F.3d 39, 59 (1st Cir. 2020) (ADA); *see also Charette v. St. John Valley Soil & Water Conservation Dist.*, 332 F. Supp. 3d 316, 351–52 (D. Me. 2018) (MHRA). Because the Acts "[have] been construed as coextensive with [each other], the Court analyzes the federal and state

claims simultaneously under the analytical framework for interpreting the ADA." *Tucker v. Town of Scarborough*, No. 2:19-cv-00213-GZS, 2020 WL 3271936, at *7 (D. Me. June 17, 2020). Here, the Plaintiff alleges both disparate treatment and hostile work environment discrimination. I analyze each of these claims below.

## B. Disparate Treatment Discrimination

In evaluating employment discrimination cases at the summary judgment stage, where, as here, there is no direct evidence of discrimination, courts use the burden-shifting analysis set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[12] *Kendrick v. Me. Med. Ctr.*, 547 F. Supp. 3d 87, 104 (D. Me. 2021); *see also Carnicella v. Mercy Hosp.*, 2017 ME 161, ¶ 16, 168 A.3d 768. Under *McDonnell Douglas*, the plaintiff must first establish a prima facie case of discrimination by showing that "he (1) was disabled within the meaning of the Acts, (2) was a 'qualified individual,' " and (3) was subject to an adverse employment action "in whole or in part because of his disability." *Austin v. Mainely Constr. Rentals, LLC*, No. 2:20-cv-00182-NT, 2022 WL 539311, at *3 (D. Me. Feb. 23, 2022). If the employee can establish the

---

[12]     There is some confusion over whether MHRA claims are still subject to the burden-shifting analysis used for ADA claims. *See Murray v. Walmart Stores*, No. 2:15-cv-00484-DBH, 2019 WL 6689900, at *14 (D. Me. Dec. 6, 2019). As discussed below, the Maine Law Court has abandoned the *McDonnell Douglas* framework for retaliation claims under the MHRA. *See Brady v. Cumberland Cnty.*, 2015 ME 143, ¶¶ 36–37, 126 A.3d 1145. The Law Court, however, has not yet clarified whether its *Brady* analysis also applies to disability-based claims of employment discrimination. *See Carnicella v. Mercy Hosp.*, 2017 ME 161, ¶ 16 n.2, 168 A.3d 768 ("Because . . . Carnicella did not present a prima facie case of employment discrimination, we do not reach the question of whether our analysis in *Brady* would apply to disability-based claims of employment discrimination."); *Bachelder v. MjjM Enters., Inc.*, No. 2:17-cv-00454-JAW, 2019 WL 921443, at *14 (D. Me. Feb. 25, 2019). In the meantime, courts have continued to apply the *McDonnell Douglas* test to MHRA claims. *See Benson v. Wal-Mart Stores E., L.P.*, 14 F.4th 13, 26 (1st Cir. 2021). Absent clearer guidance from the Law Court, and because the parties proceed as though the same analysis applies to the ADA and MHRA discrimination claims, I follow the *McDonnell Douglas* framework. *See* Def.'s Mot. for Summ. J. ("**Def.'s MSJ**") 4 n.2 (ECF No. 37); Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("**Pl.'s Opp'n**") 10 (ECF No. 41).

prima facie case, the burden shifts to the employer to articulate a legitimate reason for the termination. *See Brader*, 983 F.3d at 55. If the employer does so, the burden shifts back to the employee to show by a preponderance of the evidence that the employer's non-discriminatory reason is pretextual and the actual reason for the termination is discriminatory. *Id*.

Whole Foods claims it is entitled to summary judgment on the Plaintiff's disability discrimination claims for two reasons: (1) because the Plaintiff has not proven that he has a disability within the meaning of the ADA; and (2) because the Plaintiff cannot show that Whole Foods's legitimate reasons for his discharge were a pretext for disability discrimination. Def.'s MSJ 6, 8.

### 1.    "Disability" Under the ADA

First, the Defendant argues that the Plaintiff cannot establish that he is disabled under the ADA. In 2008, Congress passed the ADAAA, broadening the definition of "disability" to include "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." ADA Amendments Act of 2008, Pub. L. No. 110–325, 122 Stat. 3553 (codified at 42 U.S.C. § 12102(1)(A)–(C)).

Success on a claim under Section 12102(1)(A), sometimes referred to as an "actual disability" claim, "hinge[s] on whether the plaintiff has shown a physical or mental impairment that affects a major life activity, and if so, whether the impairment substantially limits the major life activity." *Mancini v. City of*

*Providence*, 909 F.3d 32, 40 (1st Cir. 2018); *see also Ramos-Echevarría v. Pichis, Inc.*, 659 F.3d 182, 187 (1st Cir. 2011). "Impairment" includes "any mental or psychological disorder, such as . . . emotional or mental illness." 29 C.F.R. § 1630.2(h)(2). " '[M]ajor life activity' contemplates . . . activities like 'caring for oneself, . . . communicating, and working . . . .' " *Mullen v. New Balance Athletics, Inc.*, No. 1:17-cv-194-NT, 2019 WL 958370, at *4 (D. Me. Feb. 27, 2019) (quoting 42 U.S.C. § 12102(2)(B)). Since the passage of the ADAAA, the term " 'substantially limits' is not intended to be a 'demanding standard' and should not engender 'extensive analysis' " beyond comparing the plaintiff's limitations to those of "the majority of people in the general population." *Mancini*, 909 F.3d at 42 (quoting 29 C.F.R. § 1630.2(j)(1)).

As an initial matter, Johnson has presented evidence that he suffers from PTSD. *See* Accommodation Substantiation Form. Whole Foods does not challenge that this is an impairment; instead, it argues that Johnson does not have an "actual disability" under the ADA because he has not shown that his PTSD substantially limits a major life activity. Def.'s MSJ 6. In support of this argument, the Defendant focuses on Johnson's psychotherapist's September 16 Certificate for Serious Health Condition Form, which was submitted to support the Plaintiff's leave of absence in August and which stated that Johnson's "condition shouldn't impact job performance as long as accommodations are made for absences." SMF ¶ 35. In pointing this out, however, the Defendant ignores the Accommodation Substantiation Form submitted in October in which Leonard indicated that Johnson's "impairment substantially limit[ed]" the following "major life activit[ies]": communicating, concentrating,

interacting with others, sleeping, and thinking. Accommodation Substantiation Form 2–3. Leonard further indicated that Johnson's PTSD substantially limited the operation of the following "major bodily function(s)": "Brain," and "Digestive." Accommodation Substantiation Form 3.

This is sufficient to create a genuine issue of material fact as to whether the Plaintiff was disabled under the ADA. The Defendant questions the thoroughness of Leonard's conclusions and challenges her reliance on Johnson's self-reported complaints, but these issues go to the weight that a factfinder should give the evidence. *See* Def.'s MSJ 6–7; Def.'s Reply in Supp. of its Mot. for Summ. J. ("**Def.'s Reply**") 4–5 (ECF No. 44); SMF ¶¶ 64–65. I am required at the summary judgment stage to view the record in the light most favorable to Johnson, and he has presented evidence here that he suffered an impairment that substantially limited major life activities.[13] Thus, summary judgment on this issue is not appropriate.

### 2.    Pretext

Since the Defendant does not challenge the Plaintiff's ability to establish the rest of the prima facie case, the analysis moves to whether the Defendant has offered a legitimate, nondiscriminatory reason for terminating him. Whole Foods says it terminated Johnson because he left his change drawer keys unattended, refused to complete the cashup procedure, left early without permission, and used inappropriate language to describe a supervisor. They also point out that these infractions were

---

[13]    The Defendant further argues that Johnson was not disabled under the "regarded as" prong of Section 12102(1)(C). Def.'s MSJ 6–8. Because there is a genuine dispute of material fact as to whether Johnson was disabled under the first prong, I do not address this argument.

done after Johnson had been given a written warning for attendance issues. Def.'s MSJ 8–12; Def.'s Reply 6.

At this step in the *McDonnell Douglass* analysis, the Plaintiff "must offer evidence that [the defendant's] explanation is pretextual and that discriminatory animus prompted the adverse action." *Cherkaoui v. City of Quincy*, 877 F.3d 14, 24 (1st Cir. 2017); *see also Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 105 (1st Cir. 2005). Having offered nondiscriminatory reasons for terminating Johnson's employment, the Defendant submits that it should be granted summary judgment because the Plaintiff cannot show that the reasons were pretextual. Def.'s MSJ 9. The Plaintiff responds that "[t]he evidence of pretext in this case is significant," and he points to contradictions in the reasons given by Whole Foods for the termination and the timing of the termination. Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("**Pl.'s Opp'n**") 14 (ECF No. 41).

Demonstrating pretext requires more than merely raising questions regarding an employer's business judgment, and courts do not sit as "super personnel departments, assessing the merits—or even the rationality—of employers' nondiscriminatory business decisions." *Brader*, 983 F.3d at 58 (quoting *Rodríguez-Cardi v. MMM Holdings, Inc.*, 936 F.3d 40, 48–49 (1st Cir. 2019)). Rather, pretext can be established by showing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" that would allow a reasonable factfinder to "infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* at 56 (quoting *Adamson v. Walgreens Co.*,

750 F.3d 73, 79 (1st Cir. 2014)). "It is insufficient that [the] Plaintiff impugn the veracity of the employer's proffered reasons . . . ; instead, a plaintiff must proffer specific facts that would enable a reasonable factfinder to conclude that the employer's reason for termination was a sham intended to cover up the employer's true motive." *Cherkaoui*, 877 F.3d at 27 (internal quotation marks omitted). The focus of the inquiry is on the employer's perception, "that is, whether the employer believed its stated reason to be credible." *Vélez v. Thermo King de P.R., Inc.*, 585 F.3d 441, 452 (1st Cir. 2009) (quoting *Azimi v. Jordan's Meats, Inc.*, 456 F.3d 228, 246 (1st Cir. 2006)).

Looking first to the cashup incident, Whole Foods stated it fired Johnson because he refused to complete the cashup training, left two hours before the end of his shift, and did not follow proper procedure to leave early. Team Member Separation Form 2. Whole Foods claims that Johnson "refused to complete" the training because he did not like how the training was being conducted and thought that other supervisors were not required to learn it. SMF ¶¶ 79, 81. But Whole Foods also admitted that Johnson told Danis that the training triggered his condition, SMF ¶ 140, and that he would get an ADA accommodation, SMF ¶ 81.

As to Johnson's early departure on the day of the cashup training, Whole Foods says that Johnson left without giving proper notice. *See* SMF ¶ 107. But the record contains evidence that Johnson told Danis that his condition was triggered during the cashup training, Johnson Dep. 180:15–180:22, 183:19–184:15; Danis Dep. 60:10–60:25; SMF ¶¶ 96, 140, and Stone said that this would have been enough to invoke

intermittent leave, 30(b)(6) Dep. 83:13–83:25. Sedgwick's letter approving his request for intermittent leave stated that Johnson would be required to inform his supervisor that he was leaving, and call Sedgwick's absence reporting line. Sedgwick Letter 2. Johnson says he made the call to Sedgwick. SMF ¶ 142.

Finally, on November 4, 2019, Sedgewick issued its report excusing Johnson's early exit on the day of the cashup training. *See* Sedgwick Letter 2. It is unclear how this absence, excused by Sedgewick on November 4, could be a reason for terminating Johnson on November 14. Interpreting the facts in the light most favorable to the Plaintiff, there are genuine issues of material fact as to whether the cashup training incident was a legitimate basis for Johnson's termination.

As further justification for the termination, Whole Foods puts forward Johnson's "insubordinate behavior" in October of 2019, referring to his refusal to complete the cashup procedure and his description of Danis as an "asshole."[14] Def.'s MSJ 1, 9–10. Though insubordination can certainly be a reason for termination, on this record, a reasonable factfinder could (but of course would not be required to) conclude that Whole Foods's proffered reason of Johnson's insubordinate behavior was used to "justify dismissal of an annoying employee who asserted [his] rights

---

[14]     "Insubordination" means "disobedient to authority." *Insubordination*, Merriam-Webster (last visited February 22, 2023), https://www.merriam-webster.com/dictionary/insubordination. Johnson was speaking to Syrek, a Supervisor like himself, when he described Danis as an "asshole," so it is a stretch to consider this insubordination. Regardless, the Team Member Separation Form does not list "inappropriate language" as one the major infractions of Whole Foods Polices for which Johnson was discharged. Team Member Separation Form 2 (ECF No. 35-25). The policies list "abusive, vulgar, obscene or indecent language or behavior towards a Team Leader" under "examples of conduct that may lead to corrective action," not under "major infractions" that "may lead to discharge." General Information Guide 47 (ECF No. 35-10). Whole Foods does not offer any evidence of other employees with a prior corrective action being fired for inappropriate language.

under the ADA." *Kelley v. Corr. Med. Servs., Inc.*, 707 F.3d 108, 118 (1st Cir. 2013) (quoting *Miller v. Ill. Dep't of Transp.*, 643 F.3d 190, 200 (7th Cir. 2011)). "While the ADA is not a license for insubordination at the workplace, the employer cannot invoke the specter of insubordination in order to mask retaliation for requesting an accommodation." *Id.* (internal quotation marks and citations omitted).

Another reason given by Whole Foods to support its decision to terminate Johnson is that he left his keys unattended. But here again the record contains conflicting evidence. Whole Foods leadership said that certain unidentified employees were put on "written warning for leaving or losing keys." Oct. 23 Emails 1. Whole Foods, however, has not provided evidence that any employee was ever terminated for similar conduct. The only specific example of another employee misplacing keys is when Danis left his keys unattended and Johnson found them. SMF ¶ 135. It does not appear that Danis was disciplined, let alone terminated, for this lapse. Stone testified that the circumstances of the incident would matter in determining consequences, but that just underscores the factual nature of this determination—the evaluation of which is better suited to a factfinder.

Whole Foods argues that the key and cashup incidents must be viewed in the context of Johnson's prior history of attendance issues. But the backdrop of attendance issues is a dubious basis for the termination where Johnson apparently had conditional approval for intermittent leave and Whole Foods ultimately excused

Johnson's absences on September 23, 25, and 27, and October 22 and 28 because of his disability.[15]

Finally, in addition to the inconsistencies in Whole Foods's proffered reasons for termination, there was close temporal proximity between Johnson's accommodation requests and his termination. This adds further support to a showing of discriminatory animus and pretext. *See Cherkaoui*, 877 F.3d at 27 (explaining that temporal proximity is "one factor from which an employer's bad motive can be inferred," though "by itself, it is not enough" (quoting *Carrero–Ojeda v. Autoridad de Energía Eléctrica*, 755 F.3d 711, 720 (1st Cir. 2014))).

Because the evidence could permit a reasonable factfinder to conclude that Whole Foods terminated Johnson *at least in part* based on his disability and accommodation requests, the question of pretext must be left for the jury. *See Carmichael v. Verso Paper, LLC*, 679 F. Supp. 2d 109, 132 (D. Me. 2010).

## C.    Hostile Work Environment

The Plaintiff also claims that he was discriminated against by virtue of the hostile work environment he endured at Whole Foods. To make out a successful

---

[15]    Whole Foods also claims that it did not have discriminatory animus because it granted accommodations and a leave of absence and hired and promoted Johnson despite knowing he had a disability. Def.'s MSJ 9. These claims must be considered in their temporal context. While Whole Foods promoted Johnson knowing he had a disability, the symptoms of that disability were only just starting to appear at the time of the promotion. *See* SMF ¶ 22. After it became clear that Johnson required intermittent leave and twelve hours between shifts, he did not receive the next promotion he applied for. *See* SMF ¶¶ 69, 110. And while Whole Foods granted a leave of absence in August, it waited weeks to approve his at-work accommodations and did so at a point when Johnson was on administrative leave pending his termination at least in part for absences related to his condition. *See* SMF ¶¶ 26, 92, 106, 124. Viewed in the light most favorable to the Plaintiff, a reasonable factfinder could infer that despite Whole Foods's willingness to hire Johnson knowing of his disability, it avoided accommodating and promoting him once the extent of his disability became clear.

hostile work environment claim, "a plaintiff must show harassment 'sufficiently severe or pervasive so as to alter the conditions of [his] employment and create an abusive work environment.'" *Maldonado-Cátala v. Mun. of Naranjito*, 876 F.3d 1, 10 (1st Cir. 2017) (quoting *Pérez-Cordero v. Wal-Mart P.R., Inc.*, 656 F.3d 19, 27 (1st Cir. 2011)). The conduct must be "both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and that [the employee] in fact did perceive it to be so." *Pérez-Cordero*, 656 F.3d at 27. This inquiry is based on "the totality of the circumstances, including factors such as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance." *Brader*, 983 F.3d at 59 (quoting *Maldonado-Cátala*, 876 F.3d at 10) (internal quotation marks omitted). "[T]he harassment also must stem from an impermissible motivation." *Id.* (quoting *Maldonado-Cátala*, 876 F.3d at 10). Though subject to "'policing at the outer bounds'" by the court, it is generally "for the jury to weigh those factors and decide whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment." *Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 19 (1st Cir. 2002) (quoting *Gorski v. N.H. Dep't of Corrs.*, 290 F.3d 466, 474 (1st Cir. 2002)).

Here, the Plaintiff offers a few incidents that he claims created a hostile work environment: (1) Woodley's Mt. Kilimanjaro comment; (2) Woodley "yell[ing]" at the Defendant for being late; (3) Danis "question[ing] the validity of Greg's medical conditions and need for accommodations;" (4) Oertel's comment about Johnson's

24

"shoes [being] on the right feet;" (5) Whole Foods failing to schedule him with the gaps between shifts that he requested; and (6) Danis telling Johnson that he would have to do the cashup procedure regardless of his accommodations. Pl.'s Opp'n 15–16. The Defendant disagrees and asserts that Johnson has not described sufficiently severe or pervasive conduct to amount to a hostile work environment. Def.'s MSJ 13. I agree with the Defendant.

First, several of the incidents cited by the Plaintiff are not offensive. For example, Johnson claims that Woodley's text message is evidence of a hostile work environment. In full, that message reads:

> You have come incredibly far and you should be so proud of yourself. I know it's easier said than done but try to not listen to anything but the good stuff. I have not heard one bad or even slightly negative thing about you and trust me if anyone has a complaint I hear about it! Hold your head high,
> . . .
> Better yet we could come up with a really great story and see how fast it spreads, like you took you spent [sic] the past few weeks climbing Mount Kilimanjaro naked with the man of your dreams. If they're gonna talk let's give them something worthy of talking about!

SMF ¶ 48; Woodley Text. Johnson felt that this was "extremely unprofessional and demeaning" because he had confided in Woodley that he was worried others were talking about his leave of absence and this would replace one rumor with another. Pl.'s Opp'n 4, 15. Reading the message as a whole, however, it is apparent that Woodley intended to be supportive, and her attempt at humor does not appear to stem from any impermissible motivation.

25

Plaintiff also claims that Woodley "yelled" at him for being late, but he provides no record support for that claim.[16] Pl.'s Opp'n 16. According to Oertel's email summary, Johnson reported that Woodley told him on the sales floor in earshot of others that "you just HAVE to stop being late." E-mail, dated 9/30/19, at 2. There is nothing objectively offensive about this comment, particularly given that his absences were not yet finally excused.

After the exchange with Woodley, the Plaintiff reported the encounter to Danis. Johnson says that Danis "questioned the validity" of his disability, when he used the words "if the accommodations are validated." *See* Pl.'s Opp'n 16; E-mail, dated 9/30/19, at 2. This is also not the kind of objectively offensive language that is part of a hostile work environment. Moreover, Danis made those statements in September, well before the accommodation process was complete, and at a time when the accommodations were conditioned on final approval.

Johnson next contends that after he said he needed an accommodation for the cashup procedure, Danis told him that he would have to do it even if he had accommodations. Johnson Dep. 182:13–25; Pl.'s Opp'n 16. It is unclear whether the cashup procedure was an essential function of the job at the time. SMF ¶ 16. Even if it was not an essential function, saying that someone would have to perform a task

---

[16]    The Defendant moves to strike Plaintiff's claim that Woodley "yelled" at him. Plaintiff responds that Woodley's tone can be inferred by Oertel's capitalization of the term "HAVE" in her email describing what Johnson told her. SMF ¶ 121. The Plaintiff concedes that Oertel did not use the term "yelled," and it is clear that Oertel was not present for the exchange but heard only the Plaintiff's description of it. SMF ¶ 121. If Woodley did in fact raise her voice, the Plaintiff, who was there, would certainly have been able to testify to that fact. But counsel did not cite any such testimony in the statement of facts, and it is not my job to scour the record in support of evidence favorable to the Plaintiff. The Defendant's request to strike the claim that Woodley yelled at Johnson is granted.

even with an accommodation is not objectively offensive, particularly when the request for accommodation was still under review.

The Plaintiff does point to one incident that could be viewed as offensive—that of Oertel's response when Johnson reported Woodley's and Danis's comments. Although Oertel's exact words and intentions are in dispute, according to the Plaintiff she said, "well, your shoes are on the right feet and you're standing upright, you don't appear to have a disability." Johnson Dep. 31:25–32:2. Reading this in the light most favorable to the Plaintiff, the comment could be taken as offensive.

Still, offhand comments and isolated incidents do not create a hostile environment unless they are extremely severe. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *see also Marrero*, 304 F.3d at 19 (finding a hostile work environment when the employee suffered from constant harassment, including "humiliating" comments, based on a protected characteristic). The remarks of Woodley, Danis, and Oertel, even viewed in the light most favorable to the Plaintiff, fit within "the ordinary, if occasionally unpleasant, vicissitudes of the workplace[.]" *Noviello v. City of Boston*, 398 F.3d 76, 92 (1st Cir. 2005); *Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 91 (1st Cir. 2018). The comments of Woodley and Danis were not overtly discriminatory, and the Plaintiff has not shown any discriminatory motive behind their comments. While Oertel's comment is more susceptible to a nefarious interpretation, it was neither severe nor repeated.

Finally, Johnson says that Whole Foods "failed to abide by Greg's schedule accommodations *four times* in the month of October." Pl.'s Opp'n 16. While it is true

that Johnson worked with less than twelve hours between shifts in October, Whole Foods had not yet finally approved Johnson's accommodation request. *See* SMF ¶¶ 106, 132; Oct. 24 Email #1. Plaintiff cites no authority to support a claim that an employer must start providing accommodations upon request. The interactive process was underway in October, and the decision to grant the requests was made in early November. The failure to give the Plaintiff more time between shifts on four occasions does not amount to evidence of a hostile work environment, particularly where the Plaintiff does not connect the scheduling issues to any impermissible motivation.

I acknowledge that " '[t]he accumulated effect' of behaviors that individually fall short may, taken together, constitute a hostile work environment." *Maldonado-Cátala*, 876 F.3d at 12 (quoting *O'Rourke v. City of Providence,* 235 F.3d 713, 729 (1st Cir. 2001)). But considering the totality of the circumstances, the Plaintiff has not demonstrated that Whole Foods's actions were sufficiently severe or pervasive to sustain a hostile work environment claim.

## II.   Retaliation

The Plaintiff has also brought claims under the ADA, MHRA, and MWPA alleging that he was retaliated against for requesting reasonable accommodations and complaining to management when he felt the accommodations were not being met. Compl. ¶ 52. The ADA's retaliation provision forbids employers from discriminating against any employee because that employee has opposed any act or

28

practice made unlawful by the ADA.[17] 42 U.S.C. § 12203(a). The MWPA prohibits employers from discharging, threatening, or discriminating against an employee who, "acting in good faith, . . . reports orally or in writing to the employer . . . what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of [Maine], a political subdivision of [Maine] or the United States."[18] 26 M.R.S. § 833(1)(A). As under the ADA, requesting a reasonable accommodation and opposing violations of the law are protected activities under the MHRA and MWPA. *See Dorr v. Woodlands Senior Living of Brewer*, *LLC*, No. 1:15-cv-00092-GZS, 2016 WL 3566202, at *11 (D. Me. June 27, 2016). "An employee's protected activity is causally connected to the adverse employment action 'when the alleged retaliation was a substantial, even though perhaps not the only, factor motivating the adverse employment action.' " *Johnson v. York Hosp.*, 2019 ME 176, ¶ 23, 222 A.3d 624 (quoting *Brady*, 2015 ME 143, ¶ 16, 126 A.3d 1145). "Any relevant evidence, including temporal proximity, may be considered in determining whether there is an arguable causal nexus." *Id.*

ADA retaliation cases are analyzed under the *McDonnell Douglas* burden-shifting analysis. *Richard v. Reg'l Sch. Unit 57*, 296 F. Supp. 3d 274, 277 (D. Me. 2017). This means that Johnson has the initial burden of establishing the prima facie

---

[17]   Courts analyze ADA retaliation claims by looking to cases arising under Title VII of the Civil Rights Act of 1964. *Greene v. New Eng. Suzuki Inst.*, No. 2:18-cv-00141-JAW, 2018 WL 3097320, at *9 (D. Me. June 22, 2018).

[18]   The MWPA does not provide a private right of action itself, but employees can obtain damages for violations by filing a civil action under the MHRA. *Murray*, 2019 WL 6689900, at *13; *see* 5 M.R.S. § 4572(1)(A) (prohibiting discrimination against employees for taking actions that are protected under the MWPA). As such, I analyze these claims together.

case—that "(1) [ ]he engaged in protected conduct; (2) [ ]he suffered an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse action." *Id.* (quoting *D.B. v. Esposito,* 675 F.3d 26, 41 (1st Cir. 2012)). If he carries this burden, Whole Foods must "articulate a legitimate, nondiscriminatory reason for doing what it did." *Id.* Then, the burden shifts back to Johnson to show that Whole Foods's reasons were pretextual. *Id.*

The retaliation analysis is slightly different for state law claims. *See Murray v. Walmart Stores*, No. 2:15-cv-00484-DBH, 2019 WL 6689900, at *6 (D. Me. Dec. 6, 2019); *Brady*, 2015 ME 143, ¶ 37, 126 A.3d 1145. Although the plaintiff must demonstrate that he engaged in protected activity and experienced an adverse employment action that was causally connected to the protected activity, the Law Court has "shelved the tripartite *McDonnell Douglas* burden-shifting framework in favor of a singular inquiry: 'whether the record as a whole would allow a jury to reasonably conclude that the adverse employment action was motivated at least in part by retaliatory intent.' " *Theriault*, 890 F.3d at 350 (quoting *Brady*, 2015 ME 143, ¶ 37, 126 A.3d 1145).

The Defendant argues that it is entitled to summary judgment on the Plaintiff's retaliation claims because the Plaintiff: (1) did not engage in protected conduct; (2) cannot demonstrate a causal link between the protected conduct and his termination; and (3) cannot show that the Defendant's reasons for firing him were pretextual. Def.'s MSJ 16–17. The reasons that support the denial of the motion for summary judgment on the ADA retaliation claim also support the denial of the

motion for summary judgment on the MHRA and MWPA claims and so I consider these claims together.

### A. Protected Conduct

The Defendant asserts that Johnson's retaliation claims fail because he was not engaged in protected conduct. According to Whole Foods, Johnson "threaten[ed] Mr. Danis that he would request an ADA accommodation to avoid learning Cash Office operations," and this is not protected conduct. Def.'s MSJ 16. It argues that not only did Johnson "never actually request[ ] an accommodation on this basis or with respect to this specific task," but he also never "request[ed] to leave early that day in connection with any alleged disability." Def.'s MSJ 16.

"Requesting an accommodation is protected conduct under the ADA." *Mullen*, 2019 WL 958370, at *8. So is voicing concern over ADA violations. *Valle-Arce v. P.R. Ports Auth.*, 651 F.3d 190, 198 (1st Cir. 2011). A plaintiff "need not prove that the conduct [ ]he opposed actually violated [the ADA], but only that '[ ]he had a good faith, reasonable belief that the underlying challenged actions of the employer violated the law.' " *Knight v. O'Reilly Auto Enters., LLC*, No. 2:17-cv-300-NT, 2019 WL 1302545, at *9 (D. Me. Mar. 21, 2019) (quoting *Fantini v. Salem State Coll.*, 557 F.3d 22, 32 (1st Cir. 2009)). To request an accommodation, the employee "must give the employer notice of the need for a special accommodation using sufficiently direct and specific language." *Dorr*, 2016 WL 3566202, at *7. "At the least, the request must explain how the accommodation requested is linked to some disability." *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 261 (1st Cir. 2001).

In claiming that Danis did not engage in protected conduct on October 28, the Defendant ignores the evidence that the Plaintiff requested accommodations and complained about ADA violations on several occasions beginning in mid-September and continuing throughout October. *See, e.g.*, SMF ¶¶ 123–24. And there is a genuine issue of material fact as to whether Johnson was requesting an accommodation during the cashup incident. *See* SMF ¶¶ 81–82; Def.'s MSJ 16. Thus, there is sufficient record evidence to defeat a motion for summary judgment on the issue of whether the Plaintiff engaged in protected conduct by requesting an accommodation.

## B.    Causal Connection

Whole Foods next contends that there was no causal connection between any protected conduct and Johnson's firing. Many sources of circumstantial evidence can demonstrate retaliation, *Mesnick*, 950 F.2d 816, 828 (1st Cir. 1991), but "[t]emporal proximity in the causation element is key," *Galvin-Assanti v. Atl. Props. Mgmt. Corp.*, 483 F. Supp. 3d 125, 141 (D.R.I. 2020). Close temporal proximity between the protected conduct and the retaliatory act by itself may establish causation, even though it may not be enough to satisfy the plaintiff's ultimate burden to show pretext. *Echevarría v. AstraZeneca Pharm. LP*, 856 F.3d 119, 138 (1st Cir. 2017). Generally, temporal proximity in the one-to-two-month range is sufficient to establish causation. *See Calero-Cerezo v. U.S. Dep't of Just.*, 355 F.3d 6, 25–26 (1st Cir. 2004) (finding that one month gap was sufficient but noting "[t]hree and four month periods have been held insufficient"); *Staples v. Verizon Data Servs., LLC*, No. 18-cv-40208-ADB, 2021 WL 1989952, at *6 (D. Mass. May 18, 2021) (causation element satisfied when

protected conduct occurred in late September and termination decision was made in late October or early November); *Morón-Barradas v. Dep't of Educ. of P.R.*, 488 F.3d 472, 481 (1st Cir. 2007) (eight-month gap insufficient).

The burden to establish causation is not onerous, and the Plaintiff meets it here by alleging a close temporal proximity between his protected conduct and the adverse outcome. Johnson engaged in protected behavior during September and October of 2019. For example, he complained of a possible violation on September 27, SMF ¶ 121, and he requested accommodations on September 18 and October 3, SMF ¶ 37. He was informed of his termination on November 14, but it is clear that Whole Foods was moving in that direction weeks earlier. *See* SMF ¶ 110. If the jury finds that he engaged in protected activity on October 28 by requesting an accommodation, the gap is just weeks. Viewing the record in the light most favorable to the non-moving party, Johnson has made out the prima facie retaliation case.

C.   **Pretext**

The Defendant next asserts that it gave legitimate non-retaliatory reasons for firing the Plaintiff and the Plaintiff cannot show that those reasons were pretextual. Def.'s MSJ 17. Although a plaintiff must allege more than just close temporal proximity between the protected conduct and the firing, *see Echevarría*, 856 F.3d at 138, here the Plaintiff points to inconsistencies and weaknesses in Whole Foods's proffered reasons, as discussed above. It is for a jury to decide whether to believe Whole Foods's reasons or find that Whole Foods fired Johnson at least in part in

retaliation for requesting attendance-based accommodations and speaking out against what he felt were ADA violations.

Because the record, construed in the light most favorable to the Plaintiff, supports an inference that his termination was motivated at least in part by protected conduct, Whole Foods is not entitled to summary judgment on the retaliation claims.

## III.  Punitive Damages

Punitive damages are available if the Plaintiff demonstrates that the Defendant "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to [his] federally protected rights." 42 U.S.C. § 1981a(b)(1); *see also* 5 M.R.S. § 4613(2)(B)(8)(c) (equivalent MHRA punitive damages provision). The Plaintiff must show this by a preponderance of the evidence under the ADA and by the higher clear-and-convincing standard under the MHRA. *Burnett v. Ocean Props., Ltd.*, 987 F.3d 57, 69 (1st Cir. 2021). The Defendant bears the burden of showing it tried to comply with the law in good faith. *Id.*

"[M]alice and reckless indifference concern, not the employer's awareness that it is discriminating, but the employer's knowledge that it is acting in violation of federal law." *McDonough v. City of Quincy*, 452 F.3d 8, 24 (1st Cir. 2006). This subjective inquiry considers whether the employer "at least discriminate[d] in the face of a perceived risk that its actions [would] violate" the law. *Burnett*, 987 F.3d at 69 (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999)). That means "punitive damages are not available 'when the employer is unaware of the federal law prohibiting discrimination, when the employer believes he can lawfully discriminate,

[or] when the underlying theory of discrimination is novel or poorly recognized[.]' " *Bell v. O'Reilly Auto Enters., LLC*, No. 1:16-cv-00501-JDL, 2022 WL 4016824, at *14 (D. Me. Sept. 2, 2022) (quoting *Che v. Mass. Bay Transp. Auth.*, 342 F.3d 31, 41 (1st Cir. 2003)). The Plaintiff may prove the employer's awareness if he can show that the employer's conduct is egregious or if there is an extensive body of law on the issue. *Id.*

Here, the Defendant claims there is no evidence that it acted recklessly or maliciously with respect to Johnson's rights. Rather, it argues that it acted in good faith because it provided Johnson with all the accommodations he requested and only fired him after conducting a thorough and fair investigation. Def.'s MSJ 19.

Reading the evidence in the light most favorable to Johnson, however, a reasonable jury could find that Whole Foods acted with reckless disregard to his rights. For example, there is evidence that Whole Foods perceived the risk that it was acting in violation of federal and state laws. Whole Foods had "equal employment opportunity," "anti-harassment," and "anti-relation" policies in addition to a reasonable accommodations policy that it followed by engaging in the interactive process. SMF ¶¶ 11–12, 40; *see Kendrick*, 547 F. Supp. 3d at 110 (denying summary judgment on punitive damages issue because having an anti-discrimination policy, providing training, and engaging in the interactive process could show both that the employer attempted to comply with the law in good faith and that it was aware it was violating the law by taking adverse action against the plaintiff). Additionally, Oertel was aware that Whole Foods should not discipline Johnson for attendance issues as

he was potentially receiving "an ADAAA accommodation for intermittent absence." SMF ¶ 120. Finally, there is an extensive body of law on the issue such that employers should know not to terminate employees due to their disability or retaliate against them for complaining of violations of the law.

Johnson also points to evidence that Whole Foods never investigated his reports of discrimination. Generally, it is evidence of reckless indifference or malicious intent if an employer ignores an employee's complaints and consistently fails to take action. *See Burnett*, 987 F.3d at 69–71 (upholding punitive damages award when employer failed to follow up three times regarding accommodation requests over a year). Johnson says he first complained about ADA violations on September 27 because his shifts were scheduled too close together and Whole Foods "never investigated" his report. Pl.'s Opp'n 14. However, Oertel reported this incident to other leadership staff and mentioned that he was in the process of pursuing intermittent leave. E-mail, dated 9/30/19 2–3. Whole Foods soon started the interactive accommodations process and eventually granted the requested accommodations. SMF ¶¶ 40, 106.

Of greater concern is the response to Johnson's complaints of discrimination and retaliation on October 30, November 1, and November 12, after the cashup incident. SMF ¶¶ 146–47, 149, 155. Johnson again claims that Whole Foods never investigated his complaints and Whole Foods does not offer any evidence that it did. Rather, Oertel responded on November 4, saying that "we disagree with the assertions in your email, as Whole Foods Market has not engaged in any unlawful

conduct." E-mail, dated 11/4/19 (ECF No. 35-60). Stone admitted that Whole Foods did not investigate in the time between Johnson's complaints and Oertel's response. SMF ¶ 152.

If the jury determines that Johnson was fired because of his disability, then it is "a short step to the imposition of punitive damages." *Harding v. Cianbro Corp.*, 498 F. Supp. 2d 344, 365 (D. Me. 2007). Large, sophisticated corporations almost certainly know that a discriminatory firing is a violation of the law. *See id.*

Because a jury could conclude on this record that Whole Foods was aware of its obligations not to discriminate or retaliate against Johnson and that it fired him because it did not want to deal with an employee with disability-based attendance issues, it is premature to take punitive damages off the table. Accordingly, summary judgment must be denied on this issue.

## CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART** the Defendant's Motion for Summary Judgment (ECF No. 37). The motion is **GRANTED** with respect to Count II and **DENIED** with respect to Counts I, III, and IV.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 23rd day of February, 2023.